JAMES G. MORRISON *vs.* SUSIE E. MORRISON.

Suffolk.   Nov. 14, 1883. — Jan. 4, 1884.   C. ALLEN & HOLMES, JJ., absent.

Evidence that a husband, from the time when he first became suspicious of his wife's infidelity, was willing in his own mind that she should commit adultery, provided that he could thereby obtain a divorce, and that he expected that she would commit adultery, and that he should obtain proof of it, and thus be enabled to procure a divorce, together with evidence that, after his suspicions of her infidelity were aroused, he frequently retired, leaving her alone with her suspected paramour, having previously arranged to have them watched by a detective, allowed her to go alone with such suspected person into the streets of the city where they lived, and also on pleasure excursions, and permitted him to use undue familiarity with her in his presence, without disapproval by him, will warrant a finding of connivance on the part of the husband, which will bar a libel for divorce filed by him, for her adultery.

If, upon the hearing of a libel for divorce, on the ground of adultery, there is evidence from which the inference of connivance may fairly be drawn, this court, upon a report of the case, will not revise the finding of such connivance.

If the libellant in a libel for divorce goes to hearing without an answer having been filed by the libellee, it is too late at the argument, upon a report of the case, to object that no answer was filed.

LIBEL for divorce, on the ground of adultery, filed August 21, 1882. Hearing before *C. Allen,* J., who refused to grant a divorce, and entered a decree dismissing the libel; and thereupon, at the request of the libellant, reported, for the consideration of the full court, the facts found by him, as follows:

"The adultery was proved as charged; and the remaining question was whether a divorce should be refused on the ground of the connivance of the libellant. The parties lived in Boston, in the Charlestown District. In February, 1882, the libellant was cautioned by his mother, from New Hampshire, who had

been at his house on a visit, to watch his wife, but she gave him no facts from which to establish adultery. Down to this time he had not suspected her of adultery, but from this caution he was led to suspect her of infidelity with one of two lodgers in his house. The one particularly suspected was named Albert R. Dixon, and he had come there to lodge in January previous, and took his meals there on Sundays. The libellant consulted legal counsel, who said 'he would undertake the case, provided he was allowed to pursue his own methods.' This was agreed to by the libellant. The method contemplated and understood by the libellant was to watch the libellee by means of a detective, with a view to ascertain if she was guilty of adultery, and, in case that fact should appear, to apply for a divorce. To enable the detective to identify and know her, it was arranged that the libellant should be with his wife at a certain place in Boston, at a certain time, where the detective could see her. The libellant also gave a description of Dixon to the detective. This was in June. He also explained to the detective the situation of his house and sitting-room, and of an alley-way from which the detective could look into the sitting-room through a window. He also told the detective that he usually went to bed at about half-past eight in the evening, and it was understood between them that after that time would be a good time for watching them. The libellant allowed Dixon to remain in his house as a lodger, and to take meals there as before, down to the time of obtaining the libellee's letter, as hereinafter stated, to pass his evenings in the family sitting-room, in company with his (libellant's) wife and such other persons as might be there, and to go out with her into the streets of Boston and elsewhere. One instance was in June, when, at the request of the libellee, the libellant told her that he would take care of the baby, and did so, in order to allow them to go together to a band concert on a Sunday afternoon, on Boston Common. Another instance was on the 4th of July, when they (Dixon and the libellee) went together, with others, on an excursion down the harbor, and, at her request, the libellant, on July 3, bought food for them to take with them. He testified that he did not know that Dixon was with them, 'but expected he was.' The libellant on that day, the 4th, was on a visit to New Hampshire.

"Dixon was in the habit, after February, of using considerable familiarity with the libellee in the libellant's presence ; as one witness said, playing, fooling, chasing her about the room, and pulling her into his lap. The libellant made no objection to this, and neither expressed nor showed any disapproval of it to either of them. On the 29th of July, the libellee went to Maine for a visit, and Dixon accompanied her and her baby to the railway station in Boston. She left the house at the usual hour when Dixon came over to his work, and the libellant went from his store in Blackstone Street to the station to see her off, and found Dixon there with her, and did not express or show any displeasure at their being together. While in Maine, on the 13th of August, she wrote a letter to Dixon, containing a plain reference to previous adulteries with him. This letter came into the libellant's possession on the 18th, 19th, or 20th of August, and he immediately thereafter instituted this libel for divorce, and had service made upon her in Maine. Dixon left the house shortly after the libellant obtained the letter, but I was not satisfied on what precise day he so left, or whether the libellant personally met him there after obtaining the letter. Prior to this time, the libellant had no absolute proof or knowledge of her adultery, though information had come to him from the detective sufficient to raise a strong presumption of it. On the strength of the letter, and from other facts and circumstances, I find that Dixon seduced her, and that there is no reason to suppose that she had committed adultery with anybody else. It did not appear at what time she first committed adultery with Dixon. It was not proved to my satisfaction that it was before the time when the libellant first consulted counsel, as above stated. There was, however, evidence tending to show that Dixon sometimes visited her in her room in February, at five o'clock in the morning, after the libellant had gone to his place of business ; but I was not satisfied that adultery was then committed. The libellant testified that he occupied the same room and bed with the libellee down to the time of her going to Maine, and that he was in the habit of getting up in the morning for his business at about five o'clock ; and these facts I find to be true. He was not asked, and did not testify, whether he was in the habit of having connection

with her down to that time. Her letter, above referred to, contained the statement that the libellant had not had any connection with her for months, and it appears to me that this statement by her, under the circumstances, was probably true, and that from the time of his consulting counsel, or shortly thereafter, he had no connection with her; and I so find.

" The libellant did no act directly to encourage adultery between his wife and Dixon, and he did nothing to prevent such adultery. He went to bed early, sometimes leaving them together in the sitting-room, and suspecting that they might commit adultery, and knowing that the detective would probably be on the watch to discover it; he made no remonstrance or objection against their being together; he concealed his suspicions from both of them; he took no pains to protect her from seduction. From the various circumstances above mentioned, I find that, from the time when his suspicions were first excited, he was in his own mind willing that she should commit adultery, provided that he could thereby obtain a divorce; and he expected that she would commit adultery, and that he should obtain proof of it, and thus be enabled to procure a divorce.

" If, upon the above facts, my decision refusing a divorce was wrong, a new trial is to be granted; otherwise, my decision to stand."

*C. R. Train,* (*A. O. Brewster* with him,) for the libellant.

*H. W. Bragg,* for the libellee.

COLBURN, J. Connivance can usually be proved only by proving facts, from which, with their circumstances, it may be inferred.

The judge who tried this case found, upon the evidence before him, certain facts from which, with the circumstances, he found that the libellant, from the time that his suspicions were first excited, was willing in his own mind that his wife should commit adultery, provided he could thereby obtain a divorce; and that he expected that she would commit adultery, and that he should obtain proof of it, and thus be enabled to procure a divorce. The finding that this was the state of the libellant's mind, together with his conduct towards his wife and her suspected paramour, after his suspicions were excited, were sufficient to warrant the finding of connivance. *Phillips* v. *Phillips,*

4 Notes of Cases, 523. *Boulting* v. *Boulting*, 3 Sw. & Tr. 329. 2 Bish. Mar. & Div. §§ 5, 6.

It is not for us to determine whether we should have drawn the same inference. There being facts and circumstances from which the inference might fairly be drawn, we cannot determine the weight and effect of the evidence, and revise the finding. *Jamaica Pond Aqueduct* v. *Chandler*, 9 Allen, 159, 166. *Sparhawk* v. *Sparhawk*, 120 Mass. 390.

. The libellant saw fit to go to trial without an answer. If he had asked for an answer, and it was not voluntarily furnished, the court would undoubtedly, upon motion, have ordered one filed. *Orrok* v. *Orrok*, 1 Mass. 341. He does not appear to have expressed any surprise at the evidence, or the defence taken at the trial, and it is now too late to object that no answer was filed.                     *Decree affirmed.*