### ˙HORACE T. ROBBINS *vs.* ANNA E. ROBBINS. ˙

Middlesex.    Nov. 10, 1885. — Jan. 9, 1886.  DEVENS & GARDNER, JJ.,
absent.

A husband, suspecting his wife of having committed adultery with a man then
lodging in his house, requested his son to telegraph him to come to another
town the next day.  The next day the telegram arrived, and the husband in-
formed his wife of its arrival, that he must go to such other town, that·he
should probably not return that night, and that, if he did, he should not return
until late; but, in pursuance of an interview with counsel, he secretly made
arrangements ꞌto be driven to his house that evening.  Between half-past eight
and nine o'clock the husband drove with a witness to his house.  He arrived
before the lights down stairs were put out, and drove round a square, and then
came back.  At about nine the lights down stairs were put out; soon afterwards
that in the wife's room was extinguished; and, from what was seen in the
lodger's room, the husband was led to suppose that his wife had entered it.
He at once entered the house, secretly, with the witness, went up stairs, and
found his wife and the lodger in bed together.  This particular act of adultery
would not have happened but for the scheme of the husband.  *Held,* that the
conduct of the husband did not, as matter of law, amount to connivance, and
that, the judge before whom the case was heard having found, as a fact, that
there was no corrupt intent on the husband's part that his wife should commit
adultery, or assent to it, he was entitled to a divorce from her.

LIBEL for divorce, on the ground of adultery. Hearing be-
fore *Holmes,* J., who found that the libellee committed adultery
on September 19, 1883, and on the question of the libellant's
connivance thereat reported the case for the consideration of
the full court, as follows:

" On the day before the adultery was committed, the libellant,
having begun to suspect his wife in connection with a man then
lodging in his house, requested his son in Boston to telegraph for
him to come to Boston the next day, if he did not come to town in
the morning. The next day the telegram arrived; the libellant
informed the libellee of its arrival, that he must go to Boston,
and that he should probably not return that night, and that, if he
did, he should not return till late; but, in pursuance of an inter-
view with counsel, he secretly made arrangements to be driven to
his house about half-past eight o'clock that evening. By reason
of the libellant's necessary visits to Boston, and otherwise, fre-
quent opportunities for adultery existed, but this particular one
would not have existed except for the scheme as stated herein.
The usual hour of going to bed was about nine. Between

half-past eight and nine, the libellant drove with a witness to his house, as he had arranged. He arrived before the lights down stairs were put out, and stopped for a moment, and then drove round a square, taking about five or six minutes, and then came back. At about nine the lights down stairs were put out; shortly after, that in the libellee's room was extinguished; and, from what was seen in the lodger's room, the libellant was led to suppose that the libellee had entered it. He then at once entered the house, secretly, with the witness, went up stairs, and found the libellee and the above-mentioned lodger in bed.

" The foregoing conduct of the libellant constituted a scheme to detect the libellee if she was guilty, but there was no corrupt intent that adultery should be committed, or any assent to or connivance at it, unless the foregoing conduct amounted to connivance, as matter of law, which I ruled it did not, and ordered a decree of divorce to be entered."

The decree was to stand, or the libel to be dismissed, according to the decision of the court upon this point.

*C. Cowley*, for the libellee.

*J. N. Marshall*, for the libellant.

FIELD, J. The justice who heard the case found as a fact that the conduct of the libellant, described in the report, constituted a scheme to detect the libellee, if she was guilty, but that there was no corrupt intent that adultery should be committed, or any assent to or connivance at it, unless the conduct of the libellant amounted to connivance as matter of law, which he ruled it did not. It is not found by whom the man who lodged in the house was invited to lodge there, or that he was of bad reputation, or was introduced by the husband to the wife, or that lodging there under the circumstances made him a member of the family, or what the conduct of the wife with him was which excited the suspicions of the husband; and it is impossible to hold that, on the facts found, it was so far the duty of the husband to expel the lodger, that, by not doing this, he must be held, as matter of law, to have connived at the adultery.

This court has assumed that the Legislature, in conferring upon it jurisdiction to grant divorces from the bond of matrimony, although the statutes make no provision respecting connivance, collusion, condonation, or recrimination, intended to

adopt the general principles which had governed the ecclesiastical courts of England in granting divorces from bed and board, so far as these principles are applicable, and are found to be reasonable. Although the procedure may be "according to the course of proceeding in ecclesiastical courts," Pub. Sts. c. 146, § 33, yet it is not clear that the decisions of those courts upon questions of substantive law are of the same weight here as are the decisions of the English courts of law and chancery. One reason is, that the ecclesiastical courts proceeded according to the canon law, as allowed and adopted in England, but the canon law was never adopted by the colonists of Massachusetts; it was not suited to their opinions or condition. Marriage and divorce here have always been regulated wholly by statute. *Commonwealth* v. *Munson*, 127 Mass. 459. *Sparhawk* v. *Sparhawk*, 116 Mass. 315.

By the St. of 20 & 21 Vict. c. 85, a court for divorce and matrimonial causes was established in England, and jurisdiction given it to decree a dissolution of marriage; and it was expressly provided that, if the court should find that the petitioner had, during the marriage, been accessory to, or conniving at, the adultery, or had condoned the adultery complained of, or that the petition was presented or prosecuted in collusion with either of the respondents, the petition should be dismissed. § 30. By § 31, it was also provided that, if the court found that the case of the petitioner was proved, and did not find either connivance, collusion, or condonation, the court should not be bound to pronounce a decree, if it should find certain other facts concerning the libellant, of which one was "such wilful neglect or misconduct as has conduced to the adultery." It is obvious that decisions under this statute may turn upon its provisions, and not upon general principles applicable to the law of divorce. It was, partially at least, upon the construction of this statute that *Gipps* v. *Gipps*, 11 H. L. Cas. 1, was decided.

It is not easy to reconcile all the decisions of the ecclesiastical courts upon connivance; the law and facts are not always separated; and those courts have considered questions of morals somewhat more freely than we, under our statutes, feel at liberty to do. Many of the cases are collected in *Phillips* v. *Phillips*, 1 Rob. Eccl. 144; 3 Notes of Cases, 444; 4 Notes of Cases, 523; 5 Notes of Cases, 435; and it is there held that a corrupt

intention is necessary to constitute connivance. The reasonable foundation of the rule, that connivance prevents the libellant from maintaining his libel for adultery, is that he has consented to the adultery, although it may be by a consent unexpressed and unknown to the libellee. This consent must necessarily often be inferred from circumstances, but the fact must be found that the libellant either desired and intended, or at least was willing, that the libellee should commit adultery, before the libellant can be said to have connived at it. There is a manifest distinction between the desire and intent of a husband that his wife, whom he believes to be chaste, should commit adultery, and his desire and intent to obtain evidence against his wife, whom he believes already to have committed adultery, and to persist in her adulterous practices whenever she has opportunity.

It was argued that it was the duty of the husband to protect his wife, and to control her conduct if it excited suspicions; and undoubtedly husband and wife ought mutually to aid each other in doing right, and to guard each other from doing wrong. But the legal duty of the husband to control the conduct of his wife cannot be greater than his legal right; and, by modern law and usage, the right of a husband to control the conduct of his wife has largely, if not wholly, disappeared. A husband cannot imprison his wife in order to protect her against seduction, nor is he compelled always to attend her, or to remain at home with her. A chaste husband ought, if he desires it, to have a wife who will remain chaste when exposed to the temptations which are incident to the ordinary conditions of modern social-life; and, if she commits adultery against his wishes, and without his procurement, he ought to be permitted to obtain evidence of it.

*Morrison* v. *Morrison*, 136 Mass. 310, was decided upon the ground that the justice who heard the cause found, as a fact, that the husband, from the time that his suspicions were first excited, was in his mind willing that his wife should commit adultery, provided that he could thereby obtain a divorce, and that this finding, together with the evidence of his conduct towards his wife and suspected paramour, was sufficient to warrant the finding of connivance. The only cases there cited are those which hold that a corrupt intent is necessary to constitute connivance. *Decree affirmed.*