JAMES G. DELANEY, respondent,

*v.*

HETTIE CARY HILLS DELANEY, appellant.

[Argued March 9th, 1906.   Decided November 27th, 1906.]

1. For a single act of adultery by a wife, a divorce will not be granted to a husband who either connived at such act, or, in legal contemplation, consented to it.

2. It is not necessary to find words or statements of the husband indicating connivance or consent. If his conduct indicates an intent, or even a willingness that the act of adultery may take place, or even culpable negligence in not preventing it, the maxim *volenti non fit injuria* applies, and the decree will be denied.

3. Consent, or willingness, on the husband's part that his wife should commit adultery is a mental state, and is to be inferred from his conduct, just as the willingness of the wife to yield her person to a paramour is to be inferred from her conduct.

---

On appeal from a decree of the court of chancery advised by Vice-Chancellor Emery, whose opinion is reported in *69 N. J. Eq. 602.*

*Mr. Thomas S. Henry,* for the appellant.

*Mr. Charles M. Meyers* and *Mr. Edward M. Colie,* for the respondent.

The opinion of the court was delivered by

FORT, J.

This is a suit for divorce on the ground of adultery.

The court of chancery found the facts to justify the conclusion that the defendant was guilty and granted the decree prayed for.

Several of the judges in this court were unable to reach that result, but we think that, even conceding the act of adultery alleged to have been proven, still the decree should not have been made, in this case, granting to the petitioner the divorce prayed for.

The petitioner and the defendant were married on July 4th, 1900, at Vancouver, British Columbia. They lived together as husband and wife until January 17th, 1905, which was two days after the alleged adulterous act of the defendant. There is no proof of any improper association with other men after the marriage of the defendant to the petitioner, up to the 15th day of January, 1905, when it was alleged the defendant was guilty of the adultery for which the decree was made. In all the proof there is shown but one single instance of the absence of the defendant from the home of the petitioner, either day or night, which even he alleges to have been suspicious. This single occurrence was upon the evening of Thursday, January 13th, 1905. That then the petitioner informed his wife he might be compelled to go on a trip, and took his bag, apparently prepared for that purpose. He returned home in the evening, not having gone as he anticipated, and found his wife absent, and she did not return until about midnight. She had in the afternoon gone to New York, as she says, to purchase a few articles for her husband and herself, and had, after making the purchases, gone to O'Neill's oyster house in that city. While there she called up by telephone Miss Elizabeth R. Kelly, an acquaint-

ance, and requested her to come to the restaurant, which she did a little before eight o'clock. She tried to persuade Miss Kelly to go home with her, and Miss Kelly, either at defendant's suggestion, or on her own motion, called up Mr. John C. Fawcett, a friend of Miss Kelly, and requested him to come to meet them. He lived in Brooklyn, and did not arrive until about ten o'clock. It was too late at that time for Miss Kelly, as she thought, to go to Newark, so they sat a few minutes and then went to the ferry of the Delaware, Lackawanna and Western railroad with defendant, coming over to the Hoboken side, and left her at the train to go to Newark, and they returned to New York to their respective homes.

Both Miss Kelly and Mr. Fawcett have been called and testified. Their evidence is clear and frank, and there is nothing to suggest that they are not persons of excellent character and entirely worthy of belief. It may have been indiscreet for the defendant to do as she did, but there is nothing in the incident to indicate any wrongdoing.

When she arrived home that night the petitioner had retired and fixed the door so that her night key would not open it. She was unable to enter her home. The petitioner appeared, finally, at the door and refused her admission. He dressed and came out, and; as he says, refused her entrance to his home, and started with her to take her to the Continental Hotel. By both his evidence and hers they went out of the apartment upon the public street and walked and talked for some time (probably for an hour), but finally came back to the apartment and went in, each going to their respective rooms. The petitioner declares that the defendant was intoxicated, and that he had to carry her upstairs, whereas her companions of that night declare she was not. He also testifies that while upon the street with his wife she admitted she had been out with Fawcett and that she had had intercourse with him. The language in which the petitioner tells the story which he alleges his wife told him is so profane and vulgar that it is not quoted here. It seems impossible to give credence to it, but he says it occurred, and that he was thus led to believe, in fact, was told, by his wife, that she had been guilty of adultery.

The defendant did not arise the next morning before her husband left. He returned to the house between one and two o'clock in the afternoon and brought with him Aubery Lockett, an employe of the Lambert Hoisting Engine Company, with whom the petitioner was also employed. He had known Lockett for some years. They were undoubtedly friends. When he thus came home with Lockett the defendant was still in bed. Lockett was a stranger to the defendant. He says he had seen her once some years before when with the petitioner at his home. The defendant denies ever seeing him before.

The petitioner took Lockett into his wife's bedroom and introduced him to her, by his own admission, in this way: "Lockett, this is the damn whore that bears my name, Mrs. Delaney." And he accused her of being out the night before with Fawcett, and says she replied: "If she was, he was a gentleman, and she liked him better than she did him, the big old slob." This is the account of the introduction given by Lockett.

The petitioner and Lockett remained, Lockett says, in the defendant's bedroom for fifteen minutes, and drank whiskey there, and, for some part of that time, the petitioner went out of the room and left Lockett there alone with the defendant. It also appears that, while thus in the room, the petitioner endeavored to get his wife to drink of the whiskey which he and Lockett were drinking, which she refused to do. The petitioner and Lockett then left the house and went to New York. While there they drank at various places and returned to Newark in the early evening, stopping in Newark at several drinking places and also drinking there. They were drinking cocktails and whiskey, and were evidently quite under the influence of liquor.

The petitioner states that they went to New York on business, but that they failed to find, on this afternoon, the person whom they were seeking.

About nine o'clock in the evening they returned to the apartments of the petitioner, and went into the parlor and also into Mrs. Delaney's room, she being still in bed, and they remained in there for some fifteen minutes. During all this time they were drinking. Then, after that, they retired.

About four o'clock the next morning the petitioner wakened

Lockett and had him get up and dress and go out to Murray's saloon, in Newark, where they again drank several cocktails. Returning home about six-thirty o'clock in the morning, they found the maid at the door, and opened it and let her in. Thereupon each of them went to their respective rooms and laid down upon the bed, as we think, without undressing, other than possibly the removal of their coats.

The defendant arose and dressed after the maid came in, and moved about the house, giving orders, and undoubtedly, under the proof, went to the room in which Lockett was at least twice, when the maid was with her, and at one time went into the room and pulled down the window shades and came out and closed the door. These two instances are testified to by the maid, as to the truthfulness of whose testimony there appears to be no reason for question. Lockett, the maid said, appeared to be asleep—at least he did not give any indication that he was awake.

While these two incidents were occurring the defendant was in her street dress. She subsequently disrobed and went to her own bed, claiming that she was ill and felt bad from the treatment which her husband had inflicted upon her, as she alleges, on the previous Thursday night, when she returned from New York, as above stated.

The room which the defendant occupied was a room just off the parlor, and the room which Lockett occupied was between the parlor and the kitchen, the door of the room which Lockett occupied being not more than ten or twelve feet from the entrance to the kitchen.

The maid testifies that she was in the kitchen during the whole time.

The petitioner says that he again arose about eight-thirty o'clock in the morning, and went to the room of Lockett, and there found Mrs. Delaney in the room, with her knee upon the bed in which Lockett was lying, and alleges that Lockett was entirely disrobed and that the defendant was in her night dress. He then states that he addressed her in this way: "You damned whore, you are even seducing my friend." And that he dragged her from the room into her own room, and that there was quite

a scene and quite a scuffle. The maid testifies that she heard nothing of this, and, so far as she is aware, nothing of the kind occurred, although she was within easy hearing distance of the scene, and the kitchen door was open, and the petitioner would have been compelled to pass the door in going to Lockett's room. Lockett testifies that the petitioner said to him at the time of the occurrence: "Lockett, I don't blame you. Get up and dress yourself, and come on with me to New York. Business is business. I don't care; I don't blame you." Lockett testifies to what may be deemed a statement that he had had intercourse with the defendant.

It appears, further, that Lockett did not then get up, nor did the petitioner (who went again to his own room), because the maid testifies that she served the petitioner and Lockett with breakfast on that morning at about half-past ten, and that they went out together, and, admittedly, they went to New York.

There was no word of condemnation, or criticism or complaint, on the part of the petitioner toward Lockett, at the occurrence which he said took place, under the circumstances just described.

When they returned from New York that night, where they were together all day, they returned together. They had been drinking during the day with customers, and they drank in Newark after they returned, probably, if their story is accepted, not together, but separately, yet in the same saloon, and while they say they were not friendly and were not drinking together, Lockett testifies, and the petitioner admits it, that when they walked out of the restaurant at Newark on the Saturday evening of the day when this adultery is said to have occurred, they took a car, and when they reached the residence of the petitioner, the petitioner said to Lockett: "Come in with me; I am afraid this woman has done something to herself— committed suicide or something." Lockett alleges that he saw Mrs. Delaney that night; that something was said to her about himself and Fawcett, but that he cannot recall what it was.

Taken as a whole, this evidence presents a most remarkable story. If the adulterous intercourse did occur, as alleged, it is difficult to believe that it was not the result of the hope that

it would occur, perhaps even of the plan of the husband that it should occur. But it is incredible that a husband, knowing of a tendency in his wife to go astray, should introduce her in the way which it is proven he did in this case; should take a stranger into her bedroom, when she was in her night dress; should drink and tender her drink, and tender his friend drink, under such circumstances, without knowing that he was inviting the very act which was finally consummated; that such conduct amounts to negligence, must be admitted on all sides.

By the twenty-second section of our Divorce act (*Revision of 1902 p. 509*), it is enacted:

"If it appear to the court that the adultery complained of shall have been occasioned by the collusion of the parties, and done with the intent to procure a divorce, or that the complainant was consenting thereto, then no divorce shall be decreed."

This language, "that the complainant was consenting thereto," is quite as broad and should be given the same effect as the common law rule of connivance in defeating a divorce.

It is not necessary to find words or statements of the petitioner indicating connivance or consent. If his conduct indicates an intent, or even a willingness, that the act of adultery may take place, or even culpable negligence in not preventing it, the maxim *volenti non fit injuria* applies, and the decree will be denied.

If the conduct of the petitioner was such as to impute to him a desire that his wife should drift into lewdness, and he, with the belief that she had a tendency in that direction, did nothing to guard her against it, or to protect her from it, then connivance and consent may be inferred.

We think that in the following respects the conduct of the petitioner imputes a desire on his part to lead his wife into lewdness, and showed an intent on his part to connive at her conduct:

1. He introduced her as a whore to a stranger.

2. He makes this introduction in her bedroom, and while there recounts, in the presence of that stranger, an alleged confession on her part of illicit intercourse with one Fawcett, and says that she was out all night the night before.

3. He knows that drink is her danger point, and that if she has gone astray it was because of this, and he invites her to drink with him and the stranger in her bedroom, while she is in bed, with nothing on but her night dress.

4. After this kind of talk and this sort of introduction, he leaves this stranger in her bedroom, to sympathize with her, as the stranger says he did, in her troubles with her husband, and the stranger states that he suggested that she tell her husband that she had been to a show the night before when she was out, or make some sort of an excuse for her absence.

5. He takes this stranger into his wife's bedroom a second time, at nine o'clock in the evening of the same day, and the night prior to the morning in which he states the adulterous intercourse occurred, and they remain there drinking for some time.

6. He puts the stranger in a room next to his wife's, with the doors of the bedroom in which he sleeps open, and that bedroom door so located that his wife must pass it to go to the bathroom for toilet purposes.

7. He declares that his wife was at that time, when in her bed, intoxicated, and that he knew it.

8. He wakes Lockett up at four o'clock in the morning and takes him out to a saloon for more liquor, and then returns him to the room next his wife's.

9. After the alleged adulterous intercourse occurred, as he alleges, he utters no word of condemnation, but treats the adulterer friendly, and breakfasts with him, in his own house, within an hour or so afterwards, and tells him at the time of the alleged discovery that he did not blame him; that he did not care, and to get up and dress himself and come on with him to New York; that business was business.

10. The evidently friendly relationship for a long time existing between Lockett and the petitioner, and the fact that Lockett was a subordinate in the business they were engaged in.

11. That during all this time his conduct was not such toward his wife as the law requires of him when he had suspicion or a belief that she was likely to fall, in this way, instead of pro-

tecting her, he threw temptation in her way, and, we believe, under the evidence, intentionally did so.

We think that while he did not say, he willed—that he, in effect, consented to that of which he now complains. *Voluit sed non dixit.*

Consent or willingness on the part of a husband that his wife should commit adultery is a mental state, and is to be inferred from his conduct, just as the willingness of the wife to yield her person to a paramour is to be inferred from her conduct. Hence, in determining whether in the present case this inference should be drawn from the petitioner's conduct, a fair question for us to ask is, what more could he have done to bring about the adulterous act than he did? In other words, what did he leave undone that would be likely to conduce to that result?

The wife and the man whom the petitioner brought home with him were strangers to each other. The presumption was that Lockett would not assume her to be lacking in chastity, or abuse the hospitality of his friend and business superior. On the contrary, the presumption is that Lockett would both respect her and also believe that sexual intercourse with her would so outrage her husband that the seducer's life might be the forfeit. The presumption of chastity was, therefore, the wife's protection, and the strongest deterrent to the advances of a would be adulterer. Obviously, if Lockett on the occasion of this first visit was to have carnal knowledge of his friend's wife, these presumptions must be removed. This the petitioner promptly proceeds to do by his initial words of introduction, by which, at one and the same time, Lockett is disabused of all idea of the wife's chastity, and the wife is apprised that Lockett will regard her as unchaste and as having lost the marital esteem which would lead her husband to avenge any act of impropriety towards her. Thus the barriers of respect and self-respect, the strongest barriers against the advances of a stranger, are swept away by the sole act of the petitioner. These barriers being removed, opportunity must still be afforded. This, as has been shown, the arrangement of the domicile amply provided.

If anything be yet lacking it is desire; whether rightly or

not, liquor is popularly supposed to have this effect—"to provoke desire," even though it may take away performance. Hence Lockett was abundantly supplied with alcohol before the visit, during the visit and afterwards, and is even awakened almost in the dead of night and taken out to be restimulated, and then returned to his bed. Liquor was also offered by the petitioner to his wife, and left where she had access to it, notwithstanding he knew of its baneful effects upon her. And all this was done by a husband who believed that his wife was unchaste, and that, only the night before, she had made attempts to solicit the embraces of a stranger.

We return, then, to the question: What did this petitioner leave undone to bring about the result of which he now seeks to complain? What more could he have done to bring it about than he did? I can think of nothing. All that the wife did, all that Lockett did and all that the petitioner did are rationally explicable only upon the inference that the husband's normal attitude of dissent to the debauching of his wife had, to the knowledge of all parties, been negatived by the petitioner's own acts. And in such a case the negation of dissent is the affirmation of consent—at least so a court will regard it when invoked by a husband to extend its aid to him, upon the theory that such dissent upon his part in fact existed, and had been normally manifested.

This I understand to be the trend of many well-considered cases.

For definition and elements of "Connivance," see *14 Cyc. 644,* *"H. Connivance."*

In *Timmings* v. *Timmings, 3 Hagg. Ec. 76,* Lord Stowell says: "He (the husband) is perfectly at liberty to let the licentiousness of the wife take its full scope, but that he is to contrive the meeting—that he is to invite the adulterer, then to take him and give him the opportunity, I do think amounts to legal prostitution."

In *Moorsom* v. *Moorsom, 3 Hagg. Ec. 105,* the same learned judge says: "It must have been seen that he has practiced a train of conduct which led to her guilt and which he foresaw and intended should lead to it. Mere passive connivance is as much a bar as active conspiracy."

In *2 Bish. Mar. & D.* § 5 *et seq.,* it is declared:

"It is a well established principle that conduct on the part of the plaintiff amounting to a conniving at the act urged as a ground for granting a divorce, will be a good defence to the action."

In *Pierce* v. *Pierce, 3 Pick. 299,* Chief-Justice Parker says: "One instance of adultery was proved, but there is reason to think that the husband was the cause of its being committed. It would be a dangerous principle to establish that a husband, who has suspicions of the infidelity of his wife, shall be allowed to lay a train which may lead her to the commission of adultery in order that he may take advantage of it to obtain a divorce."

In *Cane* v. *Cane, 39 N. J. Eq. (12 Stew.) 158,* Vice-Chancellor Van Fleet says: "If a husband sees his wife in danger, if he sees her in a position where she is likely to become subject to the power of the blandishments of a man whose character he knows to be bad and intentions evil, and he does nothing to warn her or to withhold her from his hands, but allows her to be led to her ruin and his dishonor, his conduct in law amounts to consent, and the statute declares that no divorce for adultery shall be decreed when it appears that the party applying consented thereto." And he quotes the language of Chancellor Zabriskie in *Hedden* v. *Hedden, 21 N. J. Eq. (6 C. E. Gr.) 61,* in which case it was held that if a husband sees what a reasonable man could not see without alarm, or if he knows that his wife has been guilty of any weakness whereby he is put upon his guard respecting her weakness, he is called upon to exercise peculiar vigilance and care over her, and if he sees what a reasonable man could not permit, and makes no effort to avert the danger, he must be supposed to see and mean the result.

This court, in *Warn* v. *Warn, 59 N. J. Eq. (14 Dick.)* (at p. *642*), approved of the doctrine stated in the Hedden and Crane cases, but held that there was nothing in that case "that the complainant did or that he failed to do which could reasonably impute to him a desire or anticipation that his conduct would prompt her to drift into lewdness." And said further: "Unless this intention could under the circumstances be imputed to him, it is irrelevant to consider whether it was his duty to have acted

toward her differently than he did," thus clearly implying that if the facts and circumstances were such as to impute to the petitioner or complainant "a desire or anticipation that his conduct would prompt her to drift into lewdness," that this, if established, would amount to connivance or consent.

On the principle of the cases just cited are the cases of *Morrison* v. *Morrison, 136 Mass. 310; Dennis* v. *Dennis, 68 Conn. 186; 57 Am. St. Rep. 95 (note at p. 101) ; Wilson* v. *Wilson, 154 Mass. 194; 26 Am. St. Rep. 237 (note at p. 239) ; Cairns* v. *Cairns, 109 Mass. 408.* See, also, note to *Hawkins* v. *Hawkins, 25 Am. L. Reg. (N. S.) 98.*

In *Bourgeois* v. *Chauvin, 39 La. Ann. 216,* the court says: "Where the conduct of the husband indicates an intent to have his wife transgress, or to let her do so, undisturbed, this constitutes a connivance, and will act as a bar to his suit for divorce."

In *9 Am. & Eng. Encycl. L. 829, tit. "Connivance,"* a general discussion of the subject will be found and a citation of other authorities.

A careful consideration of the proof in this case, conceding all that the petitioner claims to have occurred, leads us to the conclusion that, if it did occur, it was by his procurement and consent, and that he was conniving at the result, and that he sought to give his wife liberty to commit the act for the purpose of obtaining the divorce which he has applied for; or, if this is not so, that at least, in the language of Chancellor Zabriskie, he saw what a reasonable man could not see without alarm.

A decree of divorce on the ground of adultery will not be granted under such circumstances.

The decree of the court of chancery is reversed, and the record will be remitted, with directions to enter a decree in the case for the defendant, refusing the divorce prayed for.

*For affirmance*—THE CHIEF-JUSTICE, PITNEY, SWAYZE, REED, VROOM, GREEN—6.

*For reversal*—GARRISON, FORT, GARRETSON, HENDRICKSON, BOGERT, VREDENBURGH, GRAY, DILL—8.