## EDWARD RAYMOND FONGER *v.* EVELYN ELIZABETH FONGER.

[No. 10, January Term, 1931.]

*Decided April 24th, 1931.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*William J. Stocksdale,* with whom was *Alexander J. Lane* on the brief, for the appellant.

*J. Marsh Matthews,* for the appellee.

OFFUTT, J., delivered the opinion of the Court.

This is a proceeding instituted by the appellant, Edward R. Fonger, against his wife, Evelyn E. Fonger, the appellee, in the Circuit Court No. 2 of Baltimore City, to procure a decree divorcing him *a vinculo matrimonii* from the defendant on the ground of adultery. The appellee denied the alleged adultery and alleged that her husband had conspired to place her in "embarrassing or incriminating circumstances." The case was tried upon those issues, and at the conclusion of the trial the court dismissed appellant's bill. This appeal from that decree presents two questions, both of fact, one, whether the evidence proved the wife's guilt; second, if it did, whether the husband connived at the offense. A very careful examination of the record leaves no reasonable alternative but that of an affirmative finding on both issues.

The specific acts charged by the appellant occurred on the 22nd and 26th days of November, 1929, in the Hotel Abbey in Baltimore. The circumstances upon which the appellee relied in support of her charge of connivance are inseparably connected with those incidents, and the evidence relating to both questions is so interwoven that its application will be clearer if they are considered together. Without setting it out in detail, it is sufficient to say that the evidence establishes these facts:

The parties were married in Michigan in 1917, and lived for a time at Sparta and later at Grand Rapids, where Fonger was employed by a company engaged in the manufacture and sale of furniture. Two children were born of the marriage, of whom one, a boy, was nine years old when the suit was filed, and the other, a girl, was six years old at that time. The parties, except for a period during which the appellant was absent during the World War, lived together in Michigan until 1927, when the appellant came to Baltimore to superintend the Baltimore branch of the furniture company by which he was employed, leaving his wife and children on a farm near Grand Rapids, Mich. From that time he has seen his wife at rare intervals, for compa-

ratively short periods, and apparently never when he could avoid it.

The infidelities of which he complained are said to have occurred at the Hotel Abbey in Baltimore on the 22nd and 26th days of November, 1927, and, while the evidence as to them is clear and convincing and requires little comment, to make manifest the appellant's connection with them involves a more extended consideration of the record.

Prior to Fonger's removal to Baltimore in 1927, he and his wife appear to have lived together simply, peacefully, and, as far as the record discloses, happily. They were plain people, and their interests appear to have been confined to the little farm on which they lived and to Fonger's work. When Fonger came to Baltimore in 1927, the current of their lives was abruptly diverted into new channels. Mrs. Fonger remained on the farm, where for a time she did much of the manual labor, fed some twenty-five pigs, milked the cows, helped to harvest the crops, and did whatever else was needed to carry it on. With his removal to Baltimore, Fonger's material fortunes had brightened. He was receiving what was to persons in their station a large income, living, free from family cares, easily and comfortably in hotels and apartments, and had learned to pursue pleasure, even to the extent of dissipation, with some zest. Indeed so far did he progress that he was asked to leave a respectable boarding house because his parties were so boisterous and doubtful that they offended his fellow lodgers. His relations with other women became friendly, easy, and genial, and he came to regard not only with complacence but admiration such modern improvements in manners and morals as smoking and the consumption of "gin mixed with orange juice" by the women who moved through his new life. Taken altogether, he found life in Baltimore pleasanter than on the dreary Michigan farm with the wife of his youth, whose work as a household and farm drudge had left her little of the grace and the charm which he saw in the women with whom he associated in his new and delightful surroundings. And one of the consequences of his changed environment was that he

came to compare his wife unfavorably with these acquaintances, and such affection as he had for her was replaced by distaste and finally by positive dislike. The difference in their lives was of course apparent to her, for from time to time, with little encouragement from him, she visited him and attempted to share his improved fortunes Her visits were never invited, usually unexpected, rarely welcome, and, when she finally came to stay in November, 1927, he was not only aghast, but enraged. She did not fit into the life he was leading; he did not want her; he constantly manifested his dislike for her; and his obvious and unconcealed wish was to be rid of her. He spoke in his testimony of having doubted her chastity, but, except for certain wholly inadmissible hearsay testimony of suspicious quality, there was not the slightest evidence to justify the doubt.

Shortly after Fonger came to Baltimore in July, 1927, his wife drove to that city with an uncle, who was driving across the continent from his home in the West, and stayed at Idlehigh with her husband about three weeks. Except that he gave her the impression that he was ashamed of her because she did not smoke, Fonger's treatment of her on the occasion of that visit appears to have been kind, and, when she left to return to Michigan, they were on friendly terms. In the autumn of 1927 her health became impaired, she says, as a result of her work on the farm, and in December of that year she returned with their children to Baltimore, and stayed with her husband in an apartment until February 15th, 1928. On that visit he neglected her, did not think she should have come, gave her the impression he was ashamed of her, and said she was nothing but a farmer, unsophisticated, did not smoke, urged her to go West for her health, and on February 15th of that year she again left Baltimore. In the following May, to recuperate her health, she went with her children to visit relatives in the far West, and returned from that visit in July, 1928. Although during her absence she expressed in letters her desire to return, her husband assured her that he did not need her and urged her to stay, and, although she had wired him to meet her or

write her, when she did return to her home he neither met her nor wrote her, but did send an unsigned telegram accompanying a money order, in which he said: "Please find enclosed $50." Three days after her arrival he telegraphed her that he would be home the following week, but, to quote the witness, "he kept putting her off," until she wrote that she was either "coming to Baltimore or going back out West," and then he came home, and that appears to have been his only visit to his wife and family. Throughout that visit, the appellee testified, he was cold, overbearing, seemed to be ashamed of her, "suspicious and nasty minded," went through her trunks, and at times hardly spoke to her. She was anxious about her future, and demanded that he tell her whether she and her children were to come to Baltimore, and finally he told her that he would return on the 10th of September and take her and the children to Baltimore. He did not return in September, nor did he return at all, but in the latter part of that month she drove to Baltimore with her nephew and a party of friends, and called on him at the factory. He was shocked and surprised to see her, but, when he was told her nephew and his friends were looking for a place to stay, he took them to a small ill-kept hotel, but did not offer to take his wife to his apartments. The next day they secured better accommodations, and his wife called at the factory for him and took him to see the rooms. While he was there she locked him in the room which she had rented for him, and told him "he had to stay with" her "that night and talk things over." On that occasion she testified she said to him " 'that he had to stay with me for the looks of things, anyhow, he would have to stay with me whether he liked it or not until he gave me a definite answer why he did not want to stay with me, because it was driving me crazy and I was so embarrassed and I told him, I will give you anything in the world you want; I don't care what you want, name it, and if I can make you happy, I will do it; but, for heaven's sake, don't make me ashamed in front of my friends that I have made you a regular God to.' I said, 'You don't know how they talk to me.' So I tried everything under the

sun that night, I cried and I scolded and I got mad, and then I got glad. I done everything trying to strike the mood that I could reach him through, some chord in him I could reach for. He sat there with his arms folded like that (indicating), and said, 'Rave on.' " She further testified: "I told him the only thing—I had learned to entertain company. When I met his friends, as he called them, he always made me feel inferior to his friends, and my aunt and uncle took me to their home and showed me how to entertain people, as he called it, in his class, and showed me how to entertain people in his class being a farm girl, and I wanted to get in a nice home and show him my stuff." After that he told her to "go home and get the furniture out of storage, and get the children," and they would get an apartment. She returned home, but Fonger in his first letter to her appears to have revoked his promise, and as a result of her disappointment she was in a highly nervous condition, and consulted Dr. D. A. Dickson, of Grand Rapids, Mich., for advice and treatment. As a result of his examination, Dr. Dickson wrote Fonger:

"Just a line to let you know of the nervous condition of Mrs. Fonger.

"During the past ten days I have seen her twice and find her on the verge of a nervous breakdown.

"Physically, she is above the average, but her nervous and mental condition is not up to the normal.

"All I can find out from her regarding the cause of this condition is her being alone and away from you.

"It may be necessary that she have some institutional care, so I thought I had better let you know of her condition before the crisis comes."

Fonger paid no attention to the letter, and finally Dr. Dickson told Mrs. Fonger that he was going to Fonger's employer and complain that Fonger would not give his wife the care that her condition required and that he would not answer letters. That frightened her, for she feared Fonger would lose his position, and she at once came to Baltimore to see and warn him. His attitude towards her was such that

when she arrived she felt that he would not willingly see her, and she telephoned him that his sister wished to see him at the depot. He came at once in response to that message, but, when he arrived and saw his wife, to quote from her testimony: "I could not go on and explain the furious attitude that he had. He simply was boiling all over, he could have killed me, and he just called me down there to a finish in front of everybody in the depot. He did not care who saw him and asked me why I came down, why I did not tell him, and I said, 'I came down because you did not answer my letter and Dr. Dickson is going to expose you to the company and I came down to see you about Bernard's condition.' * * * He kept me in the depot about a half hour and he said I had to go back by the next train. 'You cannot stay here in Baltimore.' I said, 'I am going to stay all right; I have to stay a little while because I am too sick to go back.' He said, 'Well, you are going back.' 'Well,' I said, "I am not going back until this is settled.' So then he seen I was not going back on the next train and he took me down in the car somewheres and parked the car." The result of the interview was that Fonger took rooms at the Carolina Hotel, after declining to take his wife to his own apartments. In taking the rooms he refused to register as her husband until the proprietor told him that he could not have a room unless he did.

Such was Fonger's state of mind, and such his attitude towards his wife when she came to Baltimore in November, 1929, to live with him. At that time he was boarding at the home of Mrs. Roseberry, where he had been since June, 1928. Mrs. Roseberry had a son, Robert, then about forty-five years old, who was a salesman, and a daughter, Mrs. Laura Hutchins, neither of whom resided in their mother's home, although the son lived next door and took his meals there. He was on friendly terms with the members of the Roseberry household, and, to use his own expression, lived there as if he "was one of the family." Shortly before his wife came to live with them, he had been warned by her physician that she was on the verge of a nervous breakdown; she had been ill on the trip to Baltimore, and he was aware that

her mental condition was fast growing worse. Notwithstanding that, from the time of her arrival in Baltimore in November, 1929, until November 22nd, 1929, when she was found in a hotel with Roseberry, he treated her with a shrewdly calculated cruelty obviously designed to aggravate her mental distress. When she complained, he said, "Why don't you die if you are sick?" or "Why don't you die and have it over with?" On one occasion she showed him their marriage license, which had on it the motto "whom God had joined together let no man put asunder," and told him that it had "been very precious to us," and showed him her wedding ring and asked him if it had not been a "very beautiful symbol." He replied, "No, just a piece of cheap gold." And when she asked "Is that all it means to you?" he answered, "Put that d—— thing away, I never want to see it again." Except for Fonger, there was no one in Baltimore to whom she could turn for comfort or companionship, and, when in her condition her isolation in the apartment Fonger had procured became unbearable, she asked him to let her go with him on one of his trips to Philadelphia. When he refused, she begged him not to leave her "in these awful rooms alone, I can't stand it," and finally when she was frightened and feared that, if left alone, she would take her life and said to him that, if she were left alone, she would "probably jump in the bay or some place," he shook hands and said, "Well, do a good job of it, old kid."

It is apparent from the record that long before Fonger's visit to Grand Rapids in August, 1929, he had tired of his wife, and on that trip he not only insulted her by his neglect and conduct, but ransacked her trunk in search of something of an incriminating character. Finding nothing, when she came to Baltimore to stay in November, 1929, he resumed his search for such evidence under circumstances which he felt would better insure success.

Before she came, Mrs. Fonger had heard her husband's name connected with that of Mrs. Hutchins, Mrs. Roseberry's daughter, and, while there is nothing in the record which in any way reflects upon the character of that daughter, Mrs.

Fonger was anxious to see her and ask her about the rumor. Although she had been warned by Fonger to keep away from the Roseberry home, she finally saw Mrs. Hutchins, but did not see Mrs. Roseberry, but, on the following day, November 21st, she was called over the telephone by Mrs. Roseberry, who invited her to meet her that evening and dine with her. Mrs. Roseberry was an elderly woman, employed at times as a nurse, whose time, it may be assumed, was fully occupied with her duties as a nurse and boarding house keeper. Her acquaintance with Mrs. Fonger was slight and casual, and arose from her having been called in to care for the Fonger children during Mrs. Fonger's visit to Baltimore in December, 1927. Without attributing to her any conscious intent to deceive, it is fairly obvious that, except for subsequent events, there was no apparent reason why Mrs. Roseberry should have invited Mrs. Fonger to dine with her at all, or why in any event she should have invited her to dine anywhere but at her own home. Mrs. Fonger accepted the engagement, but, when she arrived at the appointed place, instead of Mrs. Roseberry, she found her son, Robert, who explained to her that his mother was unable to keep her engagement, but he invited her. (Mrs. Fonger) to dine with him. Before accepting, she called her husband over the telephone, and was told that he would be at work until 10.30 o'clock. She then accepted Roseberry's invitation, went to dinner, and afterwards to a theatre with him, and then she returned to her apartment.

On the same evening Fonger instructed one of his employees, one Louis Bode, to keep a watch on his wife's movements on the following day. She had then been living with him in Baltimore since November the first, but until that evening he had taken no steps to have her movements watched, and, unless he knew of it in advance from Roseberry, he could not have known that she was to dine with Roseberry, for Mrs. Fonger's engagement was with Mrs. Roseberry, and she herself did not know that Roseberry would be present until she met him at the place she was to meet his mother, and, unless told by Roseberry, Fonger

could not have known she would drive to Washington the next day.

That evening, when she returned to her apartment, Fonger told her that he had to go to Philadelphia. She asked him to let her go with him. He refused, and she told him that "something awful would happen," but he persisted in his refusal. The next morning she renewed her request, and, according to her testimony, was "scared to death," and said, "Ray, don't leave me in this room alone, take me with you," and he replied that he had to talk over business matters on the train, "so you cannot go, so now that is settled, shut up."

About 10 o'clock the same morning Roseberry, who had taken her to dinner the evening before and knew of her mental condition and its cause, called her over the telephone and invited her to drive to Washington, where he had to go on business. She accepted, but when she arrived she became "terribly sick" and spent some time in the rest room of a department store. The rest refreshed her, and, when she met Roseberry, he again invited her to dine with him, but she told him she wanted to call the factory to know whether her husband had really gone to Philadelphia, and that, if he had not, she wanted to return home. She did call the factory and was told that her husband had not gone. She then had Roseberry drive back to Baltimore and to the factory, where she inquired for Fonger, but failed to find him. They went to Mrs. Fonger's apartments in search of him, but failed to find him there either. She then accepted Roseberry's invitation and went to a restaurant for dinner. Because of her appearance, she had been weeping, Roseberry took her to a private dining room, and, after ordering the dinner, produced some whisky and suggested that she take a drink of it to "brace her up." From that time on Roseberry continued to ply her with whisky until she was helplessly intoxicated, then he took her in a cab to the Hotel Abbey, where he registered for both, as "R. Pryor and wife," and where they both spent the night in the same room.

That morning Roseberry called for Mrs. Fonger to go to Washington in his automobile at the Carolina Hotel where she was staying, and, when he arrived, Bode, who had been detailed the evening before to watch Mrs. Fonger, was waiting in a taxicab. Unless he had been told that Roseberry would call for Mrs. Fonger, and Roseberry alone could have furnished that information, there was no apparent necessity for an automobile. She had no automobile, and, if his object was, as he testified, to protect her from suicide, he had no need for the cab. And that conclusion is strengthened by Fonger, who said that he knew from one of his employees that his wife had "gone to Washington" with a man. But Bode, that employee, had no such information to give him, for he testified that he only followed the machine to Pratt and Payson Streets, and that they started out the Washington boulevard, but that he did not know where they went then. When they returned to the factory, Bode ordered another cab and went to the Carolina Hotel, where he found Roseberry's automobile, and followed it to the restaurant where they dined, and from there to the hotel. After Roseberry registered, Bode examined the entry, and the next day he reported to Fonger what he had learned.

Fonger said nothing to his wife of what he had learned, and no one was engaged to watch her until November 26th. In the meantime there was little change in their relations, but they do appear to have discussed renting another apartment, and on the following Monday Fonger announced to her that he was going to Philadelphia the next day. That announcement was made as a part of a plan which Fonger and his attorney had arranged the same night, which was that he was to pretend to go to Philadelphia, although he was not in fact to make the trip, that a detective was to be employed to watch Mrs. Fonger, and that he (Fonger), the detective, and Bode were all to be present to bear witness to an adultery which he anticipated would occur on the following night. When Fonger told his wife he was going to Philadelphia, she again asked to be allowed to go with him, and he again refused, and, when she renewed her request the next

morning, he said, "May be I won't have to go." But in the afternoon Roseberry called her up and said that his sister had told him that Fonger was going to Philadelphia. She then called Fonger and asked him if he intended to go to Philadelphia, and he replied that he did. She then asked if he were not coming up to say "Good bye," and he said "No," that his car had broken down. She then called Roseberry and asked him to drive her to the station to meet her husband. Roseberry consented, and she went to the station and met her husband there. She again asked him if she could accompany him, and he again refused, although he kissed her as they parted, and she returned to her hotel. About 6 o'clock Roseberry called again and asked if she would take dinner with him, and told her that he did not believe that his sister was "entirely to blame" for her trouble, but that he believed he knew the woman who was, and that he would take her to that woman's house, and that after a few drinks they would find out whether there was anything between Fonger and her. She accepted the invitation, went to the woman's house, there was drinking, what she heard made her mentally "ill," and she asked Roseberry to take her "out of there quick," that she did not want "to break down in front of her." When she got in his car, she was feeling so badly that he invited her, she said, to go to his rooms. She protested, but he told her in her condition people would think she was "drunk," and that, if she did not get better, he would call his mother, and she finally went, as she thought, to his rooms. Actually he took her to the same hotel where she had stayed on the night of November 22nd, and again he registered for both of them as "R. Pryor and wife." She was ill and hysterical, and Roseberry told her that while he was out she had better remove her dress, and lie down, and he poured ice water on her head.

Fonger, when he left his wife at the station, apparently for Philadelphia, went only as far as Havre de Grace, where he took a train back to Baltimore. He went to the factory and remained there until 11 o'clock, when he notified Bode, and he, Bode, and a third person went at once to the room in the

Abbey Hotel which his wife occupied, entered and found her and Roseberry there. He said he went there because he was notified by the "detective," and that the "detective" was present when he entered the room. He was not sure of the name of the detective, but thought it was Coleman. The detective was not called as a witness, and, except for Fonger's statement and Bode's testimony that he met a "detective" at the Abbey Hotel, there is no evidence in the case that he employed a detective at all. On the following day, November 27th, Fonger filed the bill of complaint in this case, in which, although he had seen and knew Roseberry, whom he found in the room with his wife, he alleged that she had been "guilty of adultery with divers men, the names of whom are unknown to your orator," and which he and his attorney signed.

Upon these facts it is impossible to reach any conclusion other than that Mrs. Fonger committed adultery with Roseberry. The fact that they occupied the same room in a hotel, where they were registered as husband and wife, is undisputed, and, while her denial of any wrongdoing, and her assertion that she was not mentally responsible when she went there, may possibly be true, courts cannot act upon remote possibilities, but must deal with actualities in the light of common knowledge and experience. Nor do the facts that she was an unsophisticated farm woman, alone and friendless in a strange city, with no one to whom she could turn for aid or friendship except her husband, who uniformly treated her with cold and indifferent cruelty, that as a result she was ill mentally and physically, that her life had become a burden which she attempted to end, or that, as a result of her situation, she allowed herself to indulge in intoxicating liquors until she was no longer in the possession of her will or her faculties in the eyes of the law, palliate her offense or neutralize its effect, and if her husband did not connive at it, he was entitled to the relief prayed in his bill. But if he baited and set a trap to take her in the offense, and, by his conduct, deliberately planned, to that end, so impaired her mental balance as to make her fall more certain, he will not

be permitted to complain of her wrong in a court of equity. For the foundation of equitable jurisdiction is justice, and one of its greatest landmarks is that "he who does iniquity shall not have equity," and connivance is iniquity. Bishop, in speaking of connivance, says: "Nothing can be more basely infamous or more degrading" (2 *Bishop on Marriage and Divorce*, sec. 248), and it is certain that a court of equity will not lend its aid to one who has knowingly connived at his wife's adultery (19 *C. J., "Divorce,"* secs. 187-189; 9 *R. C. L., "Divorce and Separation,"* secs. 186-189; *Barclay v. Barclay*, 98 Md. 371, 56 A. 804; *Kohlhoss v. Mobley*, 102 Md. 199, 62 A. 236; *Schouler on Marriage and Divorce*, sec. 1713), since it regards him as unclean.

Briefly stating the facts relevant to that issue, it appears that, when Mrs. Fonger came to Baltimore in November, 1929, her husband had come to dislike her; that her presence was highly objectionable; that he wanted to free himself from her; that she was in a nervous hysterical condition, which he sedulously aggravated by indifference, neglect and insult; that at that time he was on intimate terms with the Roseberry family with whom he boarded, and had been attentive to his landlady's daughter; that his wife, who had heard their names associated, visited the daughter to tell her of the rumor; that, although she did not see Mrs. Roseberry, and knew her only slightly, she was invited over the telephone by Mrs. Roseberry to meet her at a drug store in the evening of November 21st and dine with her; that, when she went to keep the engagement, she was met by Robert Roseberry, who told her his mother could not come, and he invited her to dinner; that Fonger, although he had never before employed any one to watch his wife, on that very night directed one of his employees to watch his wife's movements the next day; that on the next day that employee was present in a taxicab when Roseberry called for Mrs. Fonger to drive to Washington; that, although Bode did not know they had gone to Washington the next day, Fonger did, and he could only have known it through Roseberry; that Roseberry took her to a private dining room connected with

a restaurant, plied her with whisky until she was helplessly intoxicated, and then took her to the Abbey Hotel, where he, while she was in that condition, registered as her husband and occupied a room with her; that on the 23d, 24th and 25th days of November no one was employed to watch Mrs. Fonger and nothing occurred, but on the night of the 25th Fonger and his attorney arranged that Fonger should falsely give his wife the impression that he had gone to Philadelphia, that a detective should be employed to watch her, and that Fonger should be at hand to secure evidence of an adultery which they appeared to be sure would occur on the following night; that on November 26th Fonger did pretend to go to Philadelphia, Roseberry did call for Mrs. Fonger, he again gave her intoxicating liquor, and again took her to the same hotel, and again registered as her husband; that, as soon as that had been done, Fonger arrived, entered the room, and found them.

In connection with these facts, it further appears that the first witness called by the appellant was Robert Roseberry, who, after stating that he had occupied the room with Mrs. Fonger, was told with odd insistence by Fonger's attorney that he need not incriminate himself by stating what took place in the room, a privilege which he with a reticence equally singular accepted: that, although Fonger knew that Roseberry had committed adultery with his wife and had no reason to suspect that any one else had, he withheld his name from the suit and deliberately alleged in his bill that she had committed adultery with persons whose names were unknown to him, so that, if the case had been undefended, Roseberry's name need not have appeared, a circumstance which gains significance from the fact that one of Fonger's subordinates gave her the name of a lawyer who would, he said, represent her in the case; that, notwithstanding Roseberry's offense, Fonger still continued to reside at the Roseberry home, and was not even sure whether he was on speaking terms with Roseberry; that at the time the offense occurred Roseberry was his friend, and he was just as one of the family in the Roseberry home; that neither the supposed detective, the pro-

prietor of the Abbey Hotel, nor Mrs. White, the woman upon whom Roseberry and Mrs. Fonger called on the evening of November 26th, all of whom were in a position to have strengthened the chain of circumstances indicating Fonger's connivance, and all of whom, except the hotel proprietor, were friendly to Roseberry or Fonger, were called to testify

These facts are redolent with the unwholesome odor which characterizes much current divorce litigation, and are wholly inconsistent with any theory other than that Fonger engaged Roseberry to furnish evidence upon which he could secure a divorce. That Roseberry should deliberately undertake a campaign for the seduction of his friend's wife, a woman whom he had scarcely seen, for any other purpose, as we view it, is unreasonable. Nor can it reasonably be assumed that Roseberry would have taken a woman who, whatever her relations with her husband may have been, had certainly never injured him, in the helpless condition in which Mrs. Fonger was, to a hotel, and without her knowledge registered as her husband, unless to furnish evidence for such a suit as this. If her condition had required that she be taken somewhere, and he was moved only by the ordinary impulses of humanity, he could have left her at her own home, or a hospital, or even taken a room in her name in a hotel and called assistance. But on the contrary, he did the very thing that he would have been expected to do if he had been employed by Fonger to aid in securing a divorce. In view of these conclusions, it follows that we entirely concur in the very sound and able opinion of the chancellor, and the decree appealed from will be affirmed.

*Decree affirmed, with costs.*

---

PARKE, J., filed a dissenting opinion as follows:

I concur in the determination of the court that the wife is guilty of adultery, and, if my reading of the record had caused me to reach the conclusions stated in the prevailing opinion, I should agree that the husband could obtain no

relief because of connivance in his wife's adulterous acts. A statement and analysis of the testimony in support of my opinion that the defendant has failed to meet the burden of proof imposed upon her to establish the defense of connivance would, however, serve no other purpose than to present the argument for a rejected view. 2 *Bishop on Marriage and Divorce,* 248, 329; *Kohlhoss v. Mobley,* 102 Md. 199, 206, 207, 62 A. 236, 5 Ann. Cas. 865. I shall not indulge in so futile an act, and even this dissent would not be stated if it were not because of the firm conviction that the decision of the court necessarily involves in a conspiracy against the wife third parties, against whom I find, contrary to the view of the majority, no sufficient evidence of guilty complicity. In my judgment the record does not support the theory of a corrupt intent of one spouse, who believes the other to be chaste, to have that other fall in adultery, but is an instance of a lawful intent to obtain proof of unfaithfulness against a spouse whom the accusing spouse believes to be guilty of adultery. *Bishop on Marriage and Divorce,* vol. 2, secs. 213-214, 215, 217, 220, 226, 229, 232, 235, 248; *Kohlhoss v. Mobley,* 102 Md. 207, 62 A. 236; *Bateman v. Bateman,* 42 App. D. C. 230; *Robbins v. Robbins,* 140 Mass. 528, 531, 5 N. E. 837; *Schouler on Marriage and Divorce* (6th Ed.), secs. 1717, 1718; *Morrison v. Morrison,* 142 Mass. 361, 8 N. E. 59, 56 Am. Rep. 688.

As was said in *Bateman v. Bateman, supra*: "A wide distinction exists between the desire of the husband that his wife, in whose chastity he has faith, should commit adultery, and his efforts to secure evidence against her if he has reason to believe that she has been guilty of acts of adultery, and will commit the act again if the opportunity is afforded. In the latter case, it is not connivance to deceive his wife as to his whereabouts, or to employ counsel and detectives to assist him in procuring evidence of her infamy." Pages 233, 234 of 42 App. D. C.

Judge Sloan concurs in these views.