EWIN STEPP, Plaintiff in Error, v. EARL H. BLACK, Defendant in Error.

Middle Section. May 23, 1931.

Petition for Certiorari denied by Supreme Court, March 5, 1932.

J. D. Murphree, of Shelbyville, for plaintiff in error.
Ewell & Ewell, of Manchester, for defendant in error.

DeWITT, J. In this action Earl H. Black recovered a judgment, upon the verdict of a jury, against Ewin Stepp for $8000, for criminal conversation with his wife, alienation of her affections and seduction.

The plaintiff and his wife were married in the year 1919 and lived together as husband and wife until October 15, 1929, since which time, although married, they had not lived together. Four children, girls, were born to them. For three or four years prior to the commencement of this action they lived as tenants on the farm of an uncle of the defendant, about three-fourths of a mile from a store of the defendant's at a place called Noah, on the highway in Coffee county.

The defendant, Ewin Stepp, was a married man, about forty years of age, a prosperous merchant and farmer. He had a wife and three children.

The story revealed by this record is one of human weakness, sinfulness and domestic tragedy.

The declaration is in three counts. In the first count it is averred that the defendant, "wrongfully, wickedly and wantonly, contriving and thus unjustly intending to injure plaintiff, and to that end deprive him, plaintiff, of the comfort, society and assistance of plaintiff's said wife in his domestic affairs, and to alienate and destroy her affections for plaintiff, and to thus and thereby cause plaintiff to suffer great humiliation and mental anguish, did on or about the —— day of April, 1929, and on divers other days and times between said date and the time of the commencement of this suit, wrongfully, wickedly and wantonly have sexual intercourse with, debauch and carnally know, plaintiff's wife."

In the second count it is averred that defendant "wrongfully, wickedly and wantonly, on or about the 1st day of April, 1929, and on divers other days and times between said date and the time of the commencement of this suit, did wrongfully, wickedly and wantonly, as aforesaid, have sexual intercourse with plaintiff's said wife."

In the third count it is averred that the defendant, "for a long time before the 1st day of April, 1929, or thereabout, began to contrive, pay attention to, and design to seduce, debauch and to carnally know plaintiff's wife, and on said date, or thereabout, to-wit, the —— day of April, 1929, and divers other days and times between that date and the commencement of this suit, did wrongfully, wickedly, and wantonly seduce, debauch and carnally know Audrey Black, she being then, and for a long time before, and ever since that time, the wife of the plaintiff, thereby alienating and destroying her affections for the plaintiff."

Each count contains an averment that by reason of the premises the plaintiff "has been deprived of the comfort, society and assistance of his said wife in his domestic affairs, and also of the affections of his said wife for him, the plaintiff, the same having been alienated and destroyed, and thus has been made to suffer also great mental anguish and humiliation."

Counsel for the said plaintiff explain that these three counts were incorporated in the declaration in order that they might be applied to the case developed by the evidence, in view of certain distinctions between actions for criminal conversation and actions for alienation of affections; that while both are founded on the injury to the right of consortium, they are essentially different; that the gravamen of the action for criminal conversation is the adulterous intercourse and the resulting alienation of affections is merely a matter of aggravation; that the gravamen in the other case is the alienation of the affections with malice or improper motives. These distinctions are recognized in many cases in other jurisdictions and are clearly stated in the text in 13 R. C. L., p. 1484.

The first count of this declaration is for criminal conversation and alienation of affections; the second is for criminal conversation resulting in alienation of affections; the third is for seduction, which as applied to a married woman is included in criminal conversation, resulting in alienation of affections and loss of consortium.

To this declaration was first interposed a plea of not guilty; and during the trial the defendant, by permission, filed special pleas as follows:

"That if he did have improper relations with plaintiff's wife, the plaintiff had notice or knowledge thereof and contributed to have his wife throw herself in the way of the defendant, by frequently carrying her to defendant's store thereafter and making no complaint as to her conduct, but remaining silent and thereby passively consenting to the same."

"That he did not entice the plaintiff's wife into committing adultery, but that plaintiff's wife is and was a woman of easy virtue and adulterous disposition, and that beginning in the month of January, 1929, she visited his store on an average of three times a week and sometimes more than three times a week, and on said occasions she by her conversation and acts, sitting upon the counter in defendant's store with dress above her knees and other acts, thereby excited the passions of defendant, and that thereafter plaintiff's wife without any agreement on his part and not knowing of her presence, suddenly came to him at a secluded place on his premises and enticed defendant by saying to him, he not having made any solicitation, that it was all right, into his first act of adultery with her, and that thereafter he became infatuated and continued at her suggestion until the 28th day of September, 1929, and these facts defendant pleads in bar of recovery by plaintiff in this case."

Issue was joined on these special pleas. There is no assignment that there is no material evidence to sustain the verdict. There was sharp conflict in the evidence as to the date and manner of the first act of intercourse, as to the issues raised in the special pleas, and as to details attending primary facts which were admitted by the defendant. Upon the issue of liability of the defendant this court cannot consider the question of the weight of the evidence.

The defendant admitted in his testimony that beginning in June and ending in September, 1929, he had sexual intercourse with the plaintiff's wife eight times. The circuit judge charged the jury that in view of this admission the plaintiff was entitled to recover in some amount unless he was barred by his connivance or consent to his wife's adultery. His Honor said to the jury:

"If the husband's right herein has been interfered with by any third party having an act of sexual intercourse with his wife, then he is entitled to an action against such third party. It is a matter of indifference, so far as his right to recover is concerned, who is the seducer, whether the wife or the third party, the husband, not being to blame, cannot be required to forfeit his right of action even by the willingness of his wife, and it is no bar to the recovery of a husband that his wife procured a third party to have intercourse with her, that she

was the seducer instead of being seduced. It does become material of course, on the amount of recovery to which a husband is entitled to recover, but not his right to recover.''

Upon the effect of consent or connivance of the husband as barring his right to recover, the circuit judge very fully instructed the jury. In defining such consent or connivance he said to the jury:

"In order to be connivance his conduct must be such as shows an intention to connive; and passive connivance bars the action as effectually as active. However, mere negligence or indifference of the husband of his wife's conduct is not a defense, and cannot be construed to be consent or connivance, though it may go in mitigation of damages. The fact that a husband, on having his suspicions aroused, leaves open existing opportunities for the purpose of watching her, did not make him chargeable with connivance or consent, where he does not create new opportunities or invite the wrong. Both knowledge and acquiescence must be shown to establish consent or connivance. He cannot be charged with connivance or consent merely because he was negligent in respect to his wife's conduct, and so permitted opportunities for crime when he had no suspicion of her infidelity.''

It is insisted that the circuit judge erred in charging the jury that the burden was on the defendant to establish his plea of connivance or consent by the preponderance of the evidence; that if he carried that burden and satisfied them by the preponderance of weight of the proof that plaintiff consented to or connived at the adultery of his wife with defendant, then there could be no recovery, and their verdict should be for the defendant; that if defendant had not established that plea by such preponderance then the plaintiff was entitled to recover.

The contention made is two-fold:

(1) That by analogy with divorce cases the burden was upon the plaintiff husband to show that the adulterous conduct of his wife was without his consent or connivance, active or passive.

The statute, Shannon's Code, section 4213, provides:

"If the cause assigned for divorce be adultery, it shall be a good defense and perpetual bar to the same, if the defendant allege and prove: . . .''

(2) That the complainant, if the husband, allowed of the wife's prostitutions and received hire for them.

(3) That he exposed her to lewd company, whereby she became ensnared to the crime aforesaid.''

This statute would seem to place the burden of proof upon the party setting up such defenses. We find no decision to the contrary. But an argument from analogy would be ineffective were

the rule otherwise, for a suit for divorce is a statutory action. The case before us is a common-law action. The special pleas are pleas setting up matter in avoidance, they contain new matter relied upon to defeat the action; and, of course the burden rests upon him who asserts such facts in defense to prove them.

2. That it was error to charge the jury that the defendant had the burden to "establish" his plea of connivance and consent. Concerning this contention counsel for plaintiff in error argues:

"It was unnecessary for the defendant to furnish conclusive evidence that the plaintiff connived at or consented to the misconduct of his wife, and yet, from the above instructions by the court, the jury might well infer that it was essential for him to do so. The question is, whether these instructions given as they were without qualifications, did not tend to mislead the jury. Under the peculiar facts of this case, it being admitted by the defendant that he had criminal conversation with plaintiff's wife, his plea of connivance was his only complete and absolute defense or bar to plaintiff's action. While the facts and circumstances of this case might not of themselves establish connivance on the part of the plaintiff, yet it is quite evident they tended more or less to prove the connivance of the plaintiff, and if the court's instructions had been differently worded, or there had been some qualifications as to each of said instructions—the result would doubtless have been different."

In the earlier portion of his charge the trial judge said:

"Under the plea of the general issue filed by the defendant the burden is still upon the plaintiff, and does not shift to the defendant, to establish this plea by the preponderance of the proof, but the two special pleas filed by the defendant, the burden of establishing the allegations in each plea, shifts to and is upon the defendant, and before he can avail himself of either special plea he must prove such plea by the preponderance or weight, and if he fails to do so, as to any or both of such special pleas, it or they, cannot avail him or be any defense to him."

Again, His Honor, after elaborately stating to the jury the theory of the defendant—the many acts which he claimed to have been proven showing consent or connivance on the part of the plaintiff, said to the jury:

"If you find this contention and insistence of the defendant established by the preponderance or weight of the proof, the plaintiff would not be entitled to recover, and your verdict should promptly be in favor of the defendant."

In another part of the charge, in referring to this defense, the court said:

"His consent or connivance is a complete bar to his recovery when made out by the preponderance of proof. The fact of intercourse being proven, he is entitled to recover, unless the preponderance or weight of the proof shows that he connived or consented thereto, in which event he cannot recover; this plea, if made out, will not go in mitigation of damages, but is a complete bar to recovery."

As to the quantum of evidence required of the plaintiff, the court, after stating elaborately to the jury the theory of the plaintiff, what he claimed to have proved, said to the jury:

"If you find this insistence of the plaintiff is established by the weight of the proof, your verdict in this case should be for the plaintiff in some sum, to be fixed by you as hereinafter instructed."

After stating the substance of the pleadings the court said:

"Before the plaintiff can recover, he must establish his declaration and every material allegation thereof by the preponderance or weight of the proof. The burden is upon him, and if he fails to establish every material allegation in his declaration by such weight of the proof, your verdict should promptly be in favor of the defendant."

Thus the trial judge imposed upon both parties the burden of establishing their contentions by the preponderance of the evidence; excepting that in one reference to the defendant he not only stated that the burden was on him to establish his plea but also to satisfy the jury by the weight or preponderance of the proof.

Such use of the words, "established" and "satisfied," was indeed unfortunate, and the learned trial judge doubtless did not intend to instruct the jury that the burden was imposed upon either party to show what he contended other than by the mere weight or preponderance of the evidence. But the use of such words has been condemned as importing a degree of evidence amounting to placing a disputed proposition beyond the pale of reasonable doubt.

In Knights of Pythias v. Steele, 107 Tenn., 1, 63 S. W., 1126, the issue was as to suicide of the insured. The following instruction was held to be reversible error:

"A witness is only valuable to the extent that his evidence establishes some material fact or circumstance which aids in making clear and plain to your minds some question involved in this litigation."

Also the following instruction:

"Such is the love of life that the law presumes no man will commit suicide or intentionally kill himself, therefore the burden of proof is on the defendant to establish to the satisfaction of the jury by a preponderance of the evidence that J. K.

Steele did intentionally take a dose of morphine or other narcotic and that it produced death. If the facts and circumstances as proven in this case, establish the fact to the satisfaction of the jury that said Steele did use opiates and narcotics, but the same were not used with the intention and purpose of producing death, then the establishing of such facts would meet the requirement of the law.''

The Supreme Court, in an opinion by Mr. Justice Wilkes, said:

''The meaning of the word 'establish,' as applied to the quantum of evidence, is to settle certainly or fix permanently what was before uncertain, doubtful or disputed. 11 Am. & Eng. Enc. of Law (2 Ed.), 353. It is a term much more appropriate for criminal than civil cases, but even in criminal cases the facts do not have to be established so as to settle them certainly and leave no ground for dispute, but only beyond a reasonable doubt.''

''It is not necessary in a civil action, that any fact should be 'established,' that is, 'settled certainly' or 'fixed permanently,' which may have been uncertain, doubtful or disputed theretofore. It is not required that the evidence shall be clear and plain or that it shall satisfy any reasonable man. The word 'satisfy' means 'to free from doubt, suspense or uncertainty,' 'to set the mind at rest.' ''

''Now, it is necessary that the jury should be satisfied that there is a preponderance one way or the other, but this does not mean that it must be satisfied of the truth of the fact itself.''

The opinion continues with a clear statement of what the law does require—showing the difference between mental satisfaction of truth of facts by having been established, and a mere recognition, without freedom from doubt, suspense and uncertainty, that there is a preponderance of evidence on which the jury may rest their verdict.

All this was said in a case involving the issue of suicide as a complete defense to an action upon a contract of insurance, the issue being very doubtful upon the evidence, which was mainly circumstantial. It was of extremely vital importance that the instructions upon the quantum of evidence be correct. This case was followed by the Court of Civil Appeals in N. C. & St. L. Railway v. Sparks, at Jackson, 1922, opinion by Judge Faw—certiorari later denied by the Supreme Court. Upon the subject of the duty of the railway to show that it complied with the statutory requirement of precautions to present an accident, the trial judge said:

''The burden is upon the defendant to establish this contention and if he has done so you will return a verdict for the defendant notwithstanding said truck may have been struck and injured as claimed by the plaintiff.''

The use of the word "establish," in this instruction was held to be reversible error.

In Fisher v. Insurance Co., 124 Tenn., 508, 138 S. W., 450, the trial judge charged the jury that the complainant was entitled to a presumption that his wife did not commit suicide, and that his wife was not murdered by him or by anyone else. He then said:

"Each of these presumptions may be overcome by facts and circumstances which establish the contrary; but the court instructs you that they stand until they are overcome by the preponderance of the evidence, sufficient for that purpose."

The Supreme Court held that this use of the word, "establish," was unfortunate; but, when taken in connection with the rest of the paragraph, it could not be held reversible error. The court said that they did not think the jury could have gotten from the whole excerpt the idea that it was intended by the circuit judge to charge that the presumptions must be overcome by evidence showing the fact to be otherwise beyond reasonable doubt. Thus the case was distinguished from the Steele case, supra.

In Railway & Light Co. v. Dungey, 128 Tenn., 592, 163 S. W., 802, an instruction relating to defendant's contention as to how a collision occurred was as follows:

"If the preponderance of all the evidence shows to you that this is the truth of the case, then your verdict will be in favor of the defendant."

This was held reversible error, because it meant that in order to find a verdict for the defendant the evidence must so preponderate in its favor as to exclude a reasonable doubt of the truth of its theory as disclosed by the proof.

In behalf of defendant in error it is argued that the rigor of the words erroneously used was so modified by other instructions that the jury must have understood that no greater certainty was required than that warranted by the preponderance of the evidence.

At the request of counsel for the plaintiff in error the jury was instructed by the court as follows:

"Preponderance of evidence means the greater weight; it does not consist of the greater number of witnesses, it means, in short, just what you believe to be true."

Other instructions given by request set forth hypothetically, but in somewhat general language, the defendant's theory of fact, and then the legal result—each of said instructions beginning with the words, "If you believe from the evidence that," etc.

The use of the words, "believe" and "believe to be true," did not necessarily modify the strict meaning of the other instructions; for, taking all these expressions together, the jury may have under-

stood that such belief must only be reached from facts established to their satisfaction, and therefore beyond a reasonable doubt.

Abstractly considered, therefore, the use of the said words by the trial judge was, under the aforesaid authorities, such error as would require a reversal of the judgment and a new trial in the Circuit Court. It remains for us to determine whether or not the error of these instructions, when considered with the evidence relied on as tending to show consent or connivance, was immaterial and harmless. If so, it did not manifestly affect the verdict of the jury and would not warrant a reversal. Chapter 32, Acts of 1911. The rule is that giving in charge to a jury an abstraction, or assuming the existence of a fact not in evidence, will not constitute reversible error where it is clear that no prejudice could have resulted. 5 Michie's Dig., 177, and cases cited; James v. Memphis St. Ry., 3 Higgins, 298. In James v. Drake, 1 Shan., 109, it was ruled that the refusal of the circuit judge to charge the law upon a point about which the record did not show that there was any evidence to make the charge material, was no cause for reversal in the Supreme Court, and that in such case the presumption was that such instructions were useless. In Railroad v. Hays, 11 Lea, 382, it was again ruled that the Supreme Court will not reverse a judgment merely because the circuit judge has erroneously charged upon pleas in support of which no evidence was introduced.

If from the evidence offered in support of the plea the jury could not have reasonably concluded that the plaintiff consented or connived at the adultery, the erroneous instructions manifestly did not affect the verdict of the jury. By this extreme test we may reach a conclusion upon the issue of reversal.

The plaintiff's uncle, Jim Black, testified that in the spring of 1929 he told the plaintiff that "a certain woman" (without mentioning her name) was staying at Stepp's store too long at a time; that when plaintiff asked him who the woman was, he answered that he would have to find out for himself; that he did not think that plaintiff took the hint.

The plaintiff testified that his first information came on October 9, 1929, when Jim Black and Josh Taylor took him to the top of a hill near by, and they remained there from nine o'clock A. M. to 2 P. M.; that he saw the defendant and plaintiff's wife meet behind defendant's garage and remain out of view for ten to fifteen minutes in some tall weeds. He said that he was "shocked, nervous and blue" as the effect of this revelation.

This act of watching was brought about by Taylor and Jim Black as the result of their suspicions engendered by similar things which they had seen but which they had not revealed to the plaintiff.

On that morning, October 9th, the plaintiff and Jim Black had been in the presence of defendant, and it was stated that they were going away to look at some stock. Instead, Black and Taylor took the plaintiff upon the hill.

Plaintiff testified that when he came back from the hill he saw the defendant, but did not mention the affair to him because he wanted to catch him on the spot so that defendant and plaintiff's wife could not deny it. He said that from that day, which was Wednesday, he was heart-broken, he did not eat or sleep, and he consulted a physician as to his condition. On that following Monday he caused his wife to go with him to defendant's home, and there in the presence of defendant's wife he accused him of having torn up his home.

Plaintiff admitted that when he saw defendant on the evening of October 9th he bought a bottle of coca cola and some crackers from him and drank and ate there, and told him that they did not buy any cattle that day. On the next day he went to Manchester and consulted with counsel. On the following day he went up on the hill to watch again, but saw nothing of the character mentioned.

The evidence is undisputed that prior to October 9th, many acts of intercourse had occurred without the knowledge of the plaintiff; and there is no material evidence that prior to October 9th the plaintiff suspected that his wife was being guilty of improper conduct with anyone. There is no evidence that any act of adultery occurred after October 9th or that the plaintiff encouraged any further conduct of that sort. He admitted that he told his wife that he was going away on October 9th, but there is no evidence that he then knew what the real purpose of Taylor and Jim Black was; and the only inference is that when he thus told her he really thought that the three were going away to look at some cattle. He admitted that on Thursday night, October 10th, he went alone to the store of defendant, called his uncle Jim Black and in the hearing of defendant made an ostensible arrangement to go with him to see a mule; that on the next morning he went up on the hill and stayed until four o'clock in the afternoon watching, but did not see his wife or the defendant. He said that he did this "just to catch them so that there wouldn't be any denial;" that he expected to "walk right up on them."

Defendant testified that early on Friday morning plaintiff came to him at his woodpile and told him that his uncle Jim Black had called and wanted him to bring a set of horse shoes; that Jim Black had called him, the defendant, and told him, the defendant, and told him to send by plaintiff the horse shoes; that he did not give them to him.

Defendant testified that on Saturday afternoon plaintiff saw him at his filling station and spoke to him in his usual manner. On that afternoon plaintiff took his wife to Manchester and she remained in the automobile while he went to his attorney's office.

On Sunday, October 13th, plaintiff took his wife to church after having told defendant that although it was to be a service for men only his wife could sit in the car outside. The defendant sat on the seat behind him during the service. The preacher gave the singular invitation that all men who had Christian wives to kneel in prayer. The plaintiff testified that he thereupon left the church.

In our opinion none of this testimony amounted to evidence of consent or connivance on the part of the plaintiff. All the wrongs committed by the defendant were committed before the plaintiff became aware of the misconduct and adultery.

The fact that a husband, upon having his suspicions aroused as to the fidelity of his wife, leaves open existing opportunities for the purpose of watching her, does not make him chargeable with collusion or connivance as to the criminal conversation, where he does not create new opportunities, or invite the wrong. 30 C. J., 1126; Frank v. Berry, 128 Ia., 223, 103 N. W., 358; Woldson v. Larsen, 164 Fed., 548; Lee v. Hammond, 114 Wis., 550, 90 N. W., 1073. This rule is applied in suits for divorce on the ground of the wife's adultery, and the principle is applicable to both kinds of cases. 2 Bishop on Marriage and Divorce (6 Ed.), sec. 9; Wilson v. Wilson, 154 Mass., 194, 28 N. E., 167, 12 L. R. A., 524, 26 Am. St. Rep., 237; Robbins v. Robbins, 140 Mass., 528, 5 N. E., 837. In the last mentioned case it was held that there was no connivance where a husband pretended that he was going away over night but returned and detected the wife in adultery. The court drew the distinction as follows:

"There is a manifest distinction between the desire and intent of a husband that his wife, whom he believes to be chaste, should commit adultery, and his desire and intent to obtain evidence against his wife, whom he believes already to have committed adultery, and to persist in her adulterous practices whenever she has opportunity."

See other cases in 19 C. J., p. 91, note 42. The assignments challenging the aforesaid instructions as constituting reversible error are therefore overruled.

It is insisted that the circuit judge erred in instructing the jury as follows:

"In a case of this kind, the jury may, if you see proper, award punitive or exemplary damages. These are not only damages to compensate the injured party, but in a case of this kind the law blends the interest of society with the interest of the ag-

grieved party, and permits the jury to give such damages as would serve as a warning to others to prevent the commission of similar acts. It cannot be said to be your duty to award punitive damages, but it is within your discretion. However, you should be careful in awarding such damages, and if the actual damages sustained would be sufficient to serve as a warning to others from the commission of similar acts, then you should not award such damages. In awarding punitive damages, the financial condition of the defendant should and could be taken into consideration on the theory that larger damages are required to punish the rich than the poor, and the evidence has gone to you as to the financial condition of the defendant.''

We do not think that in giving these instructions the circuit judge invaded the province of the jury. Upon such a cause of action punitive damages are awardable in the discretion of the jury. This was the gist of these instructions. Such damages may be awarded on the basis of the willful, aggravated, malicious, or wanton character of the offense. 30 C. J., 1151. The rule in Tennessee is that exemplary damages are allowed when the wrongful act is done with a bad motive, or so recklessly as to imply a disregard of social obligations. The turpitude of defendant's conduct is alone considered, and there must be a wrong intent on his part. Railroad v. Guinan, 11 Lea, 98; Railway Co. v. Lee, 90 Tenn., 570, 18 S. W., 268; Railroad v. Ray, 101 Tenn., 1, 46 S. W., 554.

Upon a cause of action for punitive as well as compensatory damages, the function of the court is to determine whether or not the evidence tends to show facts which warrant exemplary damages; the function of the jury is then to determine the sufficiency of such facts. American Lead Pencil Co. v. Davis, 108 Tenn., 251, 66 S. W., 1129. The plaintiff's wife testified that on April 1, 1929, the defendant forced her to submit to him; that she resisted and protested, but to no avail. This testimony tended to show the elements of misconduct warranting the award of punitive damages. The fact that in ruling upon the motion for a new trial the circuit judge stated that he did not believe that the first act occurred in that way is not material here, but it will be hereinafter discussed.

It is insisted that the instruction as to punitive damages was nowhere qualified by a statement that compensatory damages are a condition prerequisite or precedent to the allowance of punitive damages. This contention is not sustainable. The court instructed the jury that if they should find that the plaintiff was entitled to recover, then they should award him such damages as would reasonably compensate him for the injury he had sustained. Then followed a thorough statement of the elements of such compensatory damages. Then followed the aforesaid instruction as to allowance

of punitive damages in the discretion of the jury. From these elaborate instructions the jurors, as intelligent men, could not have derived the notion that liability for punitive damages could be predicated upon some other ground than that which warranted the award of compensatory damages. We think that the jurors could have no other impression than that there must be liability for compensatory damages as preceding any liability for exemplary damages.

It is further contended that it was error to say that in awarding punitive damages, the financial condition of the defendant should be taken into consideration. It is not contended that evidence as to the wealth of the defendant was improperly admitted, but that the circuit judge should have left it entirely to the jury whether or not such evidence would be considered. It is perfectly evident that if he had merely told the jury that they might consider this evidence they would have considered it. The evidence was before them for their consideration. Therefore, if it was erroneous to use the word, "should," the error was harmless.

The plaintiff in error, having offered no request to supply the omission, cannot here insist that the court committed error in failing to instruct the jury that if the evidence was evenly balanced upon any issue, the burden of which was upon the plaintiff to prove, the jury should upon that issue, find for the defendant. The instructions upon the burden of proof and the weight of the evidence were not misleading as far as they went. The appellate court will therefore not reverse the judgment on such a ground. Grace v. Curley, 3 Tenn. App., 1, and cases cited.

It is urged that the judgment should be reversed because of the improper argument of counsel for the plaintiff before the jury, although the trial judge sustained the exceptions then and there taken to it and twice thereupon, before giving his formal charge and once in said charge, very clearly told the jury that what counsel said was improper and should be wholly disregarded by the jury for any purpose whatever.

The improper argument consisted in appealing to the jury for full compensation for all that the plaintiff had lost and suffered, "so that he can feed his little children."

When the court thereupon stated to counsel that his argument was improper and that under the authorities it would be reversible error, counsel turned his back upon the jury, advanced to within a few feet of the bench and pointing his finger at the court said in a loud tone of voice:

"I am arguing to the court that the jury have a right to infer that this plaintiff will take the money to feed his little children."

The trial judge thereupon said again to counsel that his argument was improper; whereupon counsel replied:

"Then I say to your Honor that this jury has a right to infer what the plaintiff will do with the money they may give him."

The plaintiff's children were not parties to the suit, and these references to them were indeed improper, yet it was plain to the jury that it was the duty of the plaintiff to feed his children. The evidence was undisputed that the plaintiff was an industrious tenant farmer who earned a living for his wife and children; and the jury could only infer that he would continue to feed his children even if no verdict were rendered in his favor. Nevertheless, the remarks made by counsel may have tended to inflame the jury with sympathy for the plaintiff. The error of making such improper remarks was, in our opinion, very probably cured by the statements to counsel and jury made by the trial judge. The matters referred to by counsel were different in character from those the mention of which were fatally condemned in Mfg. Co. v. Woodall, 115 Tenn., 605, 90 S. W., 623, and Pullman Co. v. Pennock, 118 Tenn., 565, 102 S. W., 73, and other cases, in which matters wholly extraneous were persistently mentioned by counsel and no instructions to disregard them could eliminate the poison which had been injected.

Again, a reversal is asked because counsel for the plaintiff subjected the defendant to much ridicule by his method of cross-examining him. The questions asked partook of the nature of sarcasm and ridicule, causing the spectators to indulge in laughter. The court ordered them to cease their laughter and stated that if it was not stopped he would order the sheriff to clear the court room.

The insistence made is that prejudice to the defendant was thus engendered in the minds of the jury. In our opinion, these questions of counsel, tending to excite laughter, were not of such character as alone to justify a reversal. They were based on facts already admitted by the witness, and some latitude was permissible, although the practice of asking such questions is not always to be commended.

In support of the application for a new trial for newly discovered evidence, an affidavit of W. P. Morton was read, accompanied with affidavits of defendant's, two attorneys. The affiant stated that about the first or second week in September, 1929, he told the plaintiff that it was getting to be general neighborhood talk that defendant and plaintiff's wife were "too thick;" that plaintiff told him that he already had some information of that, and said, "If I can get some eye-witnesses, I will break Stepp up." The affiant also stated that on September 25, 1929, plaintiff asked him if he had found out anything else and he replied that he had not heard anything more about it; and that the plaintiff then said to him that he had found out that what he had told him was true.

The plaintiff submitted a counter-affidavit. He admitted that he had a conversation with Morton, but stated that it related solely to a contract which he had made with a Mrs. Bailey for lease of some land. He stated that no such conversation occurred as that related by Morton. The plaintiff also submitted affidavits of Hence Winton and Ralph May to the effect that in April, 1930, Morton stated to them that the first information which he had as to the relations between defendant and plaintiff's wife was from another man (named by Winton as Tom Crosslin), who told him that Stepp had been going to Black's house so much that he had made a path through the corn; that in order to see if that was true he (Morton) went there and followed the path, and found that the path was there; and Morton stated that he thought that he would go and tell Black about it, but he then thought that if he did that, Stepp and plaintiff's wife would deny it, and that would leave him in trouble about it, and that was the reason he did not tell Black about it.

The purport of the affidavit and testimony thus given by Morton on the hearing of the motion for a new trial was that plaintiff did know of the improper relations as early as the first or second week in September, 1929. Morton's credibility was attested by several character witnesses.

The appellate court will be slow to hold that the trial judge abused his discretion in refusing a new trial where he takes special pains, as in this case, to hear the witnesses by whom it was proposed to prove the newly-discovered evidence. Jefferson v. State, 3 Shann. Cas., 330. The denial of a new trial on account of newly-discovered evidence will not be disturbed on appeal, unless there has been an abuse of discretion by the trial judge. Moore v. State, 96 Tenn., 209, 33 S. W. 1046. Newly-discovered evidence must be of such character as to convince the court that an injustice has been done and that a new trial will change the result. Tabler v. Connor, 1 Bax., 195; Demonbreun v. Walker, 4 Bax., 199; Sharp v. Treece, 1 Heisk., 447; Travis v. Bacherig, 7 Tenn. App., 645.

We are of the opinion that the trial judge was warranted in his conclusions upon this evidence, as follows:

"The court is of the opinion that, that ground is not well taken, for assuming that the facts set out are true, it doesn't show any knowledge on the part of the plaintiff in this case prior to some time in September. I believe that the witness, W. P. Morton, says the plaintiff had known it before. I think you can consider that to be true, but I do not think that, that would affect the result in this case, because there is nothing shown in the way of proof of anything plaintiff did during that time, except to try to find out if the reports he had heard were true.

"He did try to find out if these things that had come to him were true. The court is of the opinion that this ground cannot be sustained."

In two assignments it is insisted that the trial judge was influenced, though unconsciously, by prejudice, as shown by his statement that if one Forrest Rigney had not testified he would have set aside the verdict of the jury and awarded a new trial.

This witness testified that in June, 1929, he had a conversation with the plaintiff's wife; that he proposed to go home with her for the purpose of having improper relations with her; that she told him he had no business there; that he asked what business Stepp had there; and that she replied, "But you don't have the money that he has."

It is manifest that the jury did not believe this testimony. The trial judge in overruling the motion for a new trial, expressed his disbelief in it and his reaction as to the introduction of this testimony. But this was within his right. The jury had already returned its verdict. The trial judge, believing that this testimony was false, regarded it as an unwarranted attack upon the reputation of the plaintiff's wife—an additional wrong. The witness had twice been tried before him for criminal offenses and acquitted. Whatever opinion his Honor had of this witness was not expressed before the jury. If there were any error in this attitude of the trial judge it was immaterial if upon the other grounds assigned the motion for a new trial should have been overruled.

The remaining assignment of error is that the verdict is excessive, evincing passion, prejudice and caprice on the part of the jury.

The trial judge properly instructed the jury that it is no bar to recovery by a husband that his wife procured a third party to have intercourse with her, that she was the seducer instead of being seduced; but that this does, of course, become material on the amount which a husband is entitled to recover. This rule he restated with much elaboration in setting forth the elements of aggravation and mitigation to be considered by the jury in determining what would be a reasonable compensation to the husband, the plaintiff.

It is the general rule that courts will seldom interfere with the finding of a jury in actions for criminal conversation and alienation of the affections of a spouse, for the reason that there is no method of determining exactly the proper pecuniary compensation which should be awarded. Therefore, unless it is apparent that the jury was influenced by prejudice and passion, its award will seldom be interfered with. On the other hand, where it clearly appears that there was no reasonable basis for the large amount awarded, the courts should not, and have not, hesitated to adjudge the award

excessive. 13 R. C. L., 1483. The record shows that the amount of the judgment is nearly one-third of the value of all the property of the plaintiff in error. This amount indicates that it includes punitive damages. The jury evidently believed the testimony of the plaintiff's wife that the first act of intercourse was brought about by the force and violence of the defendant in compelling the woman to submit. Without this testimony there was no substantial basis in the evidence for the award of punitive damages. The trial judge stated that he did not believe that the first unlawful act occurred as the plaintiff's wife testified; that, on the other hand, he was just as frank to admit that the defendant's story how it occurred failed to make any very substantial impression on his mind (that she met him casually in a field and readily informed him of her willingness). The trial judge further said: "Now, the defendant says plaintiff's wife seduced him; she says he seduced her. I think the truth is in a happy middle ground, and that it is a case of fifty-fifty, when it comes to fixing the blame. . . . I think a middle ground for both of them is the only safe ground when it comes to placing the guilt and fixing the blame for this sin. This woman was young and good-looking, and naturally she would be slow to make a confession of her shame; and she said the only reason she admitted it was that she was afraid her husband would take her children from her. She places the blame upon the defendant for enticing her. The same thing is true on the other side; and, as I have said, I think a middle ground in this case is the only safe position to take."

Thus the finding of the jury upon the evidence tending to support the award of punitive damages was really not approved by the trial judge; and for this reason alone this court cannot affirm the judgment to that extent. Hurt v. R. R. Co., 140 Tenn., 623, 205 S. W., 437; Hamburger v. Railroad, 138 Tenn., 123, 196 S. W., 144; Telegraph & Telephone Co. v. Smithwick, 112 Tenn., 463, 79 S. W. 803. We must also interpret the trial judge's approval of the verdict as extending no further than that the moral guilt of plaintiff's wife was as great as that of the defendant. This must be taken in mitigation of the damages recoverable by the plaintiff. In view of all these circumstances, we must conclude that the jurors were influenced by passion and prejudice. This was probably intensified by the passionate appeal for a large verdict so that the plaintiff might feed his little children.

The trial judge stated that the amount of the verdict had given him much concern; that if he had been on that jury he would not have been willing to award $8,000 in a case of this kind; but that this was not the question before him, there is no definite rule to govern or limit the amount in such a case and while the court might have

fixed the judgment smaller, the mind of the jury might have been conscientiously different and it is not the court's province to trim every verdict when he would have made it less—if there is nothing to show passion, caprice or prejudice on the part of the jury. He further said:

"It is still a question in my mind as to whether this verdict should have been permitted to stand—this was the impression produced upon the mind of the court when the jury came into court and announced their verdict."

He said further that still it was necessary to look at the whole case, to consider both sides of the question to try to get the view point of the plaintiff. After stating his conclusion that the blame was equal upon the guilty persons, he said (and upon this point the evidence is almost undisputed): "But we have got to look at it in this way: This woman, so far as the evidence discloses, was a woman of good character; there is nothing shown before this case that she was not a virtuous woman, and that her life was above reproach."

He then contrasted the honest poverty of the plaintiff with the opulence and prominence of the defendant, stating that the latter was a man of fine character, a leader in business, and in social life and the church—who fell by temptation. It would extend this long opinion to a much greater length to quote all that His Honor said so soundly and so eloquently upon all these features of this unfortunate affair. He concluded with the statement that he could not hold that the jurors were influenced by passion, prejudice or caprice. But even if they were not so influenced, upon the state of this record the verdict appears to be excessive.

From the admissions of the defendant and the fact of previous chastity of plaintiff's wife, it follows as a matter of law that the plaintiff is entitled to recover a substantial amount as compensation for loss of consortium, impairment of his wife's affections, loss of her services, and his own mental anguish and even physical suffering and impairment, as to which there is abundant material evidence. 30 C. J., 1163. His motive for instituting this action is not to be taken into consideration.

It results that all of the assignments of error are overruled except that a remittitur of the sum of $3000 of the recovery is suggested. If this remittitur is accepted a judgment will be entered in this court in favor of the defendant in error for the sum of $5000 with interest from the date of the judgment in the Circuit Court and for all the costs of this cause, including the costs of the appeal which will also be adjudged against the surety on the appeal bond. If this remittitur is not accepted the entire judgment will be reversed and

the cause will be remanded to the Circuit Court for a new trial and the costs of this appeal will be adjudged against the defendant in error.

Crownover, J., and Higgins, Sp. J., concur.